[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12716

_____

D.C. Docket No. 1:18-cv-21365-KMW

ST. LOUIS CONDOMINIUM
ASSOCIATION, INC.,

Plaintiff - Appellee - Cross Appellant,

versus

ROCKHILL INSURANCE COMPANY,

Defendant - Appellant - Cross Appellee.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(July 20, 2021)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

MARTIN, Circuit Judge:

On September 10, 2017, Hurricane Irma made landfall in South Florida and caused damage to a 31-story waterfront condominium located in Miami (the "Property"). St. Louis Condominium Association, Inc. (the "Association") tried to recover for the damage to the Property from its insurer, Rockhill Insurance Company ("Rockhill"). Rockhill disputed the amount of covered damages, so the Association sued. After a jury trial, the Association received a little over $2.6 million—a fraction of the $16 million it initially asked for. Both parties were unhappy with this result. In this appeal, Rockhill challenges the final judgment entered in favor of the Association, and the Association challenges the damages award. Today we affirm the District Court's rulings as well as the jury's verdict.

## I. BACKGROUND

A. INVESTIGATION INTO DAMAGE OF THE PROPERTY

On September 13, 2017, the Association told Rockhill about the property damage caused by Hurricane Irma. The Association submitted a proof of loss form pursuant to the Rockhill policy (the "Policy")[1] claiming damages totaling $16 million. In contrast, Rockhill's inspectors determined the damage to the Property was "well below" the Policy's hurricane deductible, which requires that damage

---

[1] The Policy was effective from December 31, 2016, to December 31, 2017, and provided coverage in the amount of $20 million.

exceed 3% of the total value of the insured building, or $945,342.  Rockhill thus refused to pay for repairs, and the Association filed suit.

B.  PRETRIAL LITIGATION

The Magistrate Judge[2] recognized that "this case contain[ed] an abundance of discovery issues."  There were several motions from each party to challenge the other party's experts.  For example, Rockhill challenged the admissibility of the Association's experts under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), claiming their opinions were unreliable and their methodologies flawed.  The Association also moved to exclude some of Rockhill's experts under Daubert and strike others as a sanction for failing to comply with the District Court's scheduling order.  In relevant part, the District Court denied Rockhill's Daubert motion to strike the opinions of Paul Beers, the Association's water leakage expert, William Pyznar, the Association's expert in building engineering, and Hector Torres, a general contractor with a specialty in high rise construction appraisals, who estimated what it would cost to repair the Property. The court granted the Association's motion to strike Brian Warner, Rockhill's expert in sliding glass doors and windows, because Rockhill failed to produce him for a deposition before the already extended discovery deadline.  Here, Rockhill

---

[2] The parties consented to have Magistrate Judge Edwin G. Torres handle all discovery disputes and non-dispositive pretrial motions in this case.

3

raises issues related to these discovery rulings on appeal, so we discuss them further below.

After the close of discovery, both parties moved for summary judgment. The Association argued that the damage the Property sustained was caused by Hurricane Irma and that Rockhill was liable for that damage due to its failure to comply with the terms of the Policy. Rockhill argued it was entitled to summary judgment because the Association failed to comply with its duties under the Policy, including failing to provide the necessary documentation for the Association's claim and failing to allow Rockhill to investigate the claim.

The Magistrate Judge issued separate reports and recommendations (collectively the "R&Rs") denying both motions. Relevant to this appeal, the Magistrate Judge found there were disputed facts over which party stonewalled further inspections of the damage to the Property and ultimately breached the Policy.

Rockhill objected to the Magistrate Judge's R&R denying its motion for summary judgment. After a de novo review, the District Court affirmed and adopted both R&Rs and denied the parties' motions for summary judgment. As a result, this dispute proceeded to trial.

C. TRIAL

Trial began on May 28, 2019.  In its opening statement, the Association told the jury they would hear about the "devastating damage" to the windows and sliding glass doors of the Property, which was caused by Hurricane Irma "pull[ing] apart the frames that hold the doors and windows."  Rockhill, in turn, promised to show the jury that there was no damage directly caused by Hurricane Irma because all the damage was preexisting and not covered under the Policy.

The Association presented evidence to show the condition of the Property before and after Hurricane Irma.  Property manager Nellie Nickerson testified that she "never had complaints about windows or any water intrusion" before the hurricane and the building was in "optimal condition."  A July 12, 2017, quality assurance inspection from the management company Ms. Nickerson worked for noted no problems with the windows and no visible cracking in the building's exterior.  After the hurricane, however, Ms. Nickerson saw "[c]haos like a war zone" and received at least 45 incident reports from unit owners complaining of damage, especially to sliding glass doors and windows.

Maria Del Castillo, president of the Association's board of directors and a resident of the Property since it was built in 1995, testified that the board members walked the building once a week to ensure it remained in "the best utmost condition at all times."  When she returned to the property after Hurricane Irma,

5

Ms. Del Castillo saw "ten blown windows" and "debris everywhere." When she got to her own unit, the water intrusion had warped her flooring, her shutters had been broken from the force of the wind, and her windows would no longer open. Ms. Del Castillo's husband, an architect, thought the balancers (devices that make the windows go up and down) were broken, but when he replaced the balancers, the window frames themselves were still warped.

Based on the problems with the windows and sliding glass doors, the Association filed an insurance claim with Rockhill. Ms. Nickerson contacted Daniel Odess, a public adjuster, to help process the damage included in the claim.[3] Mr. Odess testified that he had firsthand knowledge of the building from previous work "going back to approximately 2012," and said that the building was "[v]ery well maintained." He was not aware of any preexisting water intrusion issues. Mr. Odess also said he assembled experts for the Association, and the experts began their investigations to render opinions on the amount of the loss.

These experts included Mr. Beers, Mr. Pyznar, and Mr. Torres, who all testified at trial about the opinions they reached. Mr. Beers testified that he owns a firm specializing in the exterior "building envelope," meaning the outside of a building, and had, at the time of trial, 40 years of experience in water intrusion and repairing water leaks to windows and sliding glass doors. He relied on information

---

[3] Public adjusters help insurance policy holders prepare and settle insurance claims.

provided from firsthand observers about the condition of the Property before Hurricane Irma, visually inspected the Property for damage, and performed "pressure chamber" tests to simulate a summer storm to reach a conclusion regarding the extent and cause of the damage.  Mr. Beers found that 88% of the Property's windows and sliding glass doors were damaged.  Mr. Beers opined that there was no evidence that any damage was caused by the age of the building.  He also addressed how to replace the windows and sliding glass doors.  Because the manufacturer of the original windows and doors went out of business, and the products were unique to that manufacturer and no longer available, Mr. Beers said the only way to repair the windows and doors was to install new ones.

Mr. Pyznar testified as a forensic engineering expert on building envelope failures.  He relied on information provided from firsthand observers about the condition of the Property before Hurricane Irma, and he visually inspected the interiors of nine units and the entirety of the exterior by reviewing footage of the building taken from a drone equipped with a video camera.[4]  Mr. Pyznar reviewed the drone video footage with the jury, and described "[r]acking" of the windows. This meant "the window assembly [w]as distorted" and would "not function properly" because the window was not flush with the frame.  The gaskets no longer

---

[4] Mr. Pyznar also had the unique opportunity to personally observe the condition of the building because he did not evacuate for Hurricane Irma, and he lived near enough to the Property that he had a "clear shot" of the Property from his apartment.

7

held a seal, which allowed water to enter. Mr. Pyznar concluded that this damage was caused by Hurricane Irma.

Mr. Torres, a general contractor specializing in high-rise construction, prepared an estimate to show how much it would cost to replace all the windows and sliding glass doors in the Property. He also inspected the Property and determined a "complete reassembly of the building envelope" was needed to repair the damage. The individual components could not be replaced because windows and sliding glass doors are part of an assembly, so a "residual reconstruction" would have to be performed. That process includes taking out the existing window or door assemblies and the damaged outer perimeter of the stucco, concrete, and drywall, and replacing it with a new system. The estimate Mr. Torres prepared addressed the overall damage to the Property, and therefore included some items unrelated to the replacement of the doors and windows, as well as both direct and indirect costs (including labor, management, insurance, etc.). Mr. Torres's estimate totaled $16,036,942.

Once the Association rested, Rockhill moved for judgment as a matter of law under Rule 50(a). It argued the Association's evidence was legally insufficient to hold Rockhill liable because the Association knew the damage was preexisting and "let it sit." The District Court denied the motion on the record, saying that "it seems that you are again challenging the expertise of the [Association's]

8

witnesses" and "conflating your argument with actual genuine issues of fact." The District Court therefore found there was nothing yet in evidence to support Rockhill's theory and the Association's case was sufficient to go to a jury. The court summarized the facts in evidence up to this point:

> The plaintiff has either through stipulation or witness testimony adduced that there was a valid contract and policy between the parties. All of the witnesses have testified that the losses were occasioned by Hurricane Irma, and that the money damages that they calculated were not occasioned by any excluded event . . . . And Ms. Nickerson, [and] Ms. Del Castillo[] . . . both testified to the condition of the building immediately before and immediately after.

Trial proceeded, and Rockhill presented evidence to support its case that the damage to the Property was not caused by Hurricane Irma. To this end, Rockhill presented two experts, Bert Davis and Janine Pardee. Mr. Davis is a forensic engineer who specializes in building systems and building envelopes. He visually inspected the Property on three occasions in early 2018 (around 5 months after Hurricane Irma), looked at National Weather Service data for the area, and reviewed Mr. Pyznar's report. Of the units he entered, Mr. Davis was able to open 90% of the windows and sliding glass doors. Some of the doors were harder to open than others, and he concluded that was due to the age of the doors based on his observation that parts of the aluminum frame rubbed together. Mr. Davis did not observe any wind damage from the storm to the door systems or the windows.

9

If there were leaks, he said, it was due to part of the window assembly wearing out over time. Like Mr. Pyznar, Mr. Davis observed windows that were "racked," but he concluded the racking was caused by problems with the window balancers, not Hurricane Irma. Mr. Davis also testified that to repair the racked windows, it was not necessary to replace the entire window assembly.

Ms. Pardee is a structural engineer who specializes in masonry and hurricane damage assessment. Rockhill hired her to "perform the structural part of the survey and to look at the exterior stucco; mainly the main structure, the stucco and some other surfaces." She explained that the Property was designed to withstand 120 mile per hour winds, and based on weather data, the 60 mile per hour winds blowing through that part of Miami would not have caused much damage. Ms. Pardee did observe some structural cracks and stucco cracking, including in the stucco on some of the balconies. However, she said neither variety of cracking was caused by the hurricane, asserting instead that the structural cracks were from the building settling, and the stucco cracks were caused by a lack of waterproofing on the concrete forming the balconies.

At the end of Rockhill's case, the Association moved for judgment as a matter of law under Rule 50(a), challenging the sufficiency of Rockhill's evidence to show preexisting damage. The District Court denied the motion based on Rockhill's evidence.

10

Rockhill filed a renewed motion for judgment as a matter of law, which the District Court again denied. Rockhill again cited its criticisms of the Association's experts, and said that Ms. Pardee and Mr. Davis provided evidence that there was no damage to the Property caused by Hurricane Irma. The court agreed with that characterization and found a genuine dispute of fact to be decided by the jury.

After five days of trial, the jury reached a verdict. The jury found that Rockhill breached the Policy by failing to pay for covered losses, and that the Association suffered $3,673,303.67 in covered losses. However, the jury found that some damage the Association claimed was hurricane-related was actually preexisting in the amount of $359,578.

D. POST-TRIAL MOTIONS

After trial, the Association filed one motion under Rule 50(b) and another under Rule 59(e), both making identical arguments. In each motion, the Association sought to strike the jury's set-off of $359,578 for preexisting damage and asked the court to refrain from applying the Policy's 3% hurricane deductible. As to the preexisting damage, the Association argued: (1) that the only testimony in the record to show there was preexisting damage came from Mr. Davis, who did not provide support for his conclusion and whose testimony was therefore insufficient; and (2) that Rockhill wholly failed to prove the dollar amount of those preexisting conditions. As to the hurricane deductible, the Association argued that

11

the percentage-deductible violated Florida Statute § 627.701(2)(b), which says that an insurance policy cannot contain a deductible provision that "[s]tates the deductible as a percentage rather than as a specific amount of money" unless Florida's Office of Insurance Regulation determines the percentage-deductible provision is clear and unambiguous.

Rockhill opposed both motions on the same grounds.  First, it said the jury's preexisting damage finding was supported by Ms. Pardee's testimony that the delamination of stucco finish and paint on the undersides of the Property's balconies was caused by long-term moisture damage and was therefore a preexisting condition.  Rockhill relied on meeting minutes from the Association's board of directors, which showed the board discussed the need to have these repairs made before Hurricane Irma.  Rockhill argued that competent evidence supported the amount of preexisting damage by pointing to Mr. Torres's repair estimate, which included a line item of $359,578—the exact amount the jury found—for "7100 Waterproofing/15 General Caulking – Windows/Doors." Rockhill also argued that enforcing the Policy's 3% hurricane deductible was proper.

The District Court denied the Association's Rule 50(b) and Rule 59(e) motions.  As to preexisting damages, the District Court found that the dispute about whether or not the line item amount was related to witness testimony (and

whether it was corroborated by other evidence) was a question properly left to the jury. Drawing all reasonable inferences in favor of Rockhill, the court denied the motion to strike the jury's finding of preexisting damages. As to the hurricane deductible, the District Court found that the Association's reliance on § 627.701 fell short because the Policy language was clear and unambiguous.

The District Court thus entered an amended final judgment on August 27, 2019. Rockhill appealed and the Association filed a cross-appeal.

## II. STANDARDS OF REVIEW

We review de novo the denial of a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50, viewing the evidence in the light most favorable to the non-moving party. Howard v. Walgreen Co., 605 F.3d 1239, 1242 (11th Cir. 2010). Rule 50 motions should be granted "only when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." Id. (quotation marks omitted). When the sufficiency of the plaintiff's evidence is being challenged based on the admissibility of expert testimony, we review the District Court's admissibility finding for an abuse of discretion. See United States v. Brown, 415 F.3d 1257, 1266, 1270 n.1 (11th Cir. 2005).

We review the District Court's evidentiary rulings, including its decision to admit or exclude expert testimony, for abuse of discretion. Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1103 (11th Cir. 2005).

We review the denial of a motion to alter or amend the judgment under Rule 59(e) for abuse of discretion, unless the ruling turns on a question of law. EEOC v. St. Joseph's Hosp., Inc., 842 F.3d 1333, 1343 (11th Cir. 2016). If that is the case, we review de novo the question of law. Id.

## III. ROCKHILL'S APPEAL

We read Rockhill's briefing to raise four arguments on appeal: (1) the Magistrate Judge erred by striking Rockhill's expert, Brian Warner; (2) the District Court erred by denying Rockhill's motion for summary judgment; (3) the Magistrate Judge abused his discretion by finding that the Association's experts met the requirements of Rule 702; and (4) the District Court erred by denying Rockhill's motion for judgment as a matter of law because the evidence was insufficient to support a verdict for the Association. However, we need not discuss the merits of Rockhill's summary judgment challenge because our precedent clearly bars review of an order denying summary judgment after a full trial and judgment on the merits. Lind v. United Parcel Serv., Inc., 254 F.3d 1281, 1286 (11th Cir. 2001). With that, we turn to the three remaining issues on appeal.

14

A. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY
   STRIKING ROCKHILL'S EXPERT

We "have often held that a district court's decision to hold litigants to the
clear terms of its scheduling orders is not an abuse of discretion."  Josendis v. Wall
to Wall Residence Repairs, Inc., 662 F.3d 1292, 1307 (11th Cir. 2011); see also
Bearint ex rel. Bearint v. Dorell Juvenile Grp., Inc., 389 F.3d 1339, 1349 (11th Cir.
2004) ("Given the wide latitude the district court has to exclude untimely
submissions, we cannot say that it abused its discretion to exclude this report.").
Rockhill's challenge to the exclusion of its expert is most accurately viewed as a
challenge to the District Court's power to manage its docket.

The Magistrate Judge was correct in his observation that "this case
contain[ed] an abundance of discovery issues."  One issue is related to the
difficulty in scheduling the deposition of Rockhill's expert, Brian Warner.  On
November 6, 2018, the Association asked to schedule dates for Mr. Warner's
deposition.  When Rockhill failed to respond, the Association followed up with a
voicemail on November 19, 2018 and an email confirming the Association was
"still waiting to hear from Mr. Warner with dates for that week for his deposition."
The next day, Rockhill responded and said Mr. Warner was not available for a
deposition until January 7, 2019, but that Rockhill would check again "to see if he

15

could change his schedule." Based on these representations, the deposition would have taken place after the close of discovery on December 14, 2018.[5]

Rockhill sent the Association another email on November 30, 2018, explaining that Mr. Warner could be available on December 13 (one day before the discovery deadline). The Association responded that December 13 was available, but because it was the same date Rockhill had provided for the deposition of another of its experts, Bert Davis, the Association said they would need to find an alternative date for Mr. Davis if Mr. Warner was only available on December 13. Six days later, and one week before the proposed date for Mr. Warner's deposition, Rockhill told the Association that Warner was suddenly unavailable on December 13 and again said his earliest availability would not be until January 2019. After the difficulty in scheduling depositions for several of Rockhill's experts, including Mr. Warner, the Association moved to strike the experts.

On this record, the Magistrate Judge granted the Association's motion to strike Mr. Warner's testimony. The judge reasoned that because Rockhill "could not provide a single date" when Mr. Warner was available before the expert discovery deadline, Warner should be stricken as an expert.[6]

---

[5] Expert discovery was first set to close on December 7, 2018, but the Magistrate Judge had already granted the parties a one-week extension.

[6] The District Court denied Rockhill's motion for reconsideration of the Magistrate Judge's order.

In this appeal Rockhill does not dispute the Magistrate Judge's findings about the parties' inability to schedule Mr. Warner's deposition. Instead, it says the Magistrate Judge should have treated Mr. Warner like he treated Rockhill's other experts—Janine Pardee and Irving Oppenheim—who were deposed after the discovery deadline following an extension of the deadline.

However, the Magistrate Judge's reasons for allowing Ms. Pardee and Mr. Oppenheim's depositions to proceed differ greatly than the reasons for striking Mr. Warner. After recounting the Association's many attempts to schedule Mr. Warner's deposition, the Magistrate Judge found—and Rockhill concedes—that it violated the District Court's scheduling order. The Magistrate Judge also found— and Rockhill does not dispute—that Rockhill "could not provide a single date" when Mr. Warner was available before the expert discovery deadline. The judge went on: "[A] party cannot disclose its experts and then claim that they are unavailable to be deposed until after the discovery deadline. If parties had that privilege, there would be no use for a Scheduling Order because parties could simply disregard it at their convenience."

By comparison, the Magistrate Judge declined to strike Ms. Pardee and Mr. Oppenheim because the Association failed to "articulate any specific reasons," attributable to Rockhill or not, for the scheduling failure. He said the Association "merely suggest[ed]" that Ms. Pardee and Mr. Oppenheim were not deposed

17

because they either failed to appear or were not provided, which was not enough to enter Rule 37 sanctions.  Because these facts are supported by the record, the District Court did not abuse its discretion by holding Rockhill to the scheduling order and striking Mr. Warner.  This is especially so after the Magistrate Judge had already extended the expert discovery deadline.  See Josendis, 662 F.3d at 1307 (holding that even though the District Court had the authority to grant an extension of the discovery deadline for good cause, "it was under no obligation to do so").

## B. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DENYING ROCKHILL'S DAUBERT MOTION

Now we address Rockhill's challenge to the District Court's Daubert findings.  See Appellant – Cross-Appellee's Br. at 40–42 (acknowledging that the District Court correctly concluded Rockhill was challenging Mr. Torres's and Mr. Pyznar's methodology, and Mr. Beers's reliability, under Daubert).

The record makes clear that the Magistrate Judge did not abuse his discretion in finding that Mr. Torres's, Mr. Pyznar's, and Mr. Beers's opinions were admissible.  Rockhill's briefing of this issue leaves much to be desired, but in essence, it raises the same Daubert admissibility arguments it made before the District Court.[7]  It challenges Mr. Torres's methodology as unreliable because he

---

[7] Federal Rule of Evidence 702 provides that expert testimony is admissible if (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts

spent only 5 hours at the Property, failed to conduct any testing, "relied overwhelmingly on the reports of an undisclosed building engineer and unit owners" to conclude that repairing the Property would cost $16 million, and failed to include an opinion on causation or other information on the Property's condition before Hurricane Irma hit. Rockhill says Mr. Pyznar's methodology was flawed because he also relied on information from an undisclosed building engineer, as well as information "taken at face value" from the Association's property manager. Rockhill also argues Mr. Pyznar inspected only nine units and cherry-picked high-speed wind strength data from other parts of Florida in order to reach his opinion that Hurricane Irma caused the damage to the Property. Finally, Rockhill says Mr. Beers's opinion was not reliable for two reasons: (1) Beers does not have a college degree and therefore Rockhill believes he is "incompetent," and (2) he "deliberately failed to consider pre-Hurricane Irma maintenance records."

The Magistrate Judge found that Rockhill's Daubert challenges "lack[ed] merit." The judge noted that Mr. Torres conducted a thorough review of the Property by inspecting 2/3 of the Property's 130 units and the building's exterior and roofing. Mr. Torres also consulted the property manager and engineering staff to determine if there were water damage complaints from unit owners before the

---

or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

19

hurricane.  The Magistrate Judge also found that Mr. Pyznar did not take the information he learned at face value—he visually inspected the property as well. Finally, the judge found Mr. Beers's opinion was not unreliable, recognizing that Beers had 40 years of experience and specialized in water leak repairs.  For all three of the Association's experts, the Magistrate Judge said that Rockhill's challenges go to the weight, rather than the admissibility, of their opinions.  The Magistrate Judge applied the proper legal standard,[8] and his fact findings are not "manifestly erroneous."  United States v. Barton, 909 F.3d 1323, 1330 (11th Cir. 2018).  It was not an abuse of discretion to deny Rockhill's Daubert motion as to these three experts.

## C.  ROCKHILL DID NOT PRESERVE ITS CHALLENGE TO THE DENIAL OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW

Rockhill also claims that despite the denial of its Daubert motions, the evidence at trial, viewed in the light most favorable to the Association, makes clear that Rockhill's experts' testimony trumps the Association's experts' testimony. See Appellant – Cross-Appellee's Br. at 43 ("Pardee and Davis[] clearly demonstrated the absence of a direct physical loss . . . due to Hurricane Irma.");

---

[8] Under Federal Rule of Evidence 703, experts can base their opinion on facts or data in the case "that the expert has been made aware of."  Fed. R. Evid. 703.  And under Rule 702, the evidence an expert relies on simply must be "based on sufficient facts or data," and is "the product of reliable principles and methods," that the expert has "reliably applied . . . to the facts of the case."  Fed. R. Evid. 702.

Oral Argument Recording at 4:08–4:27 (June 29, 2021) ("[E]ven if you take St. Louis's experts and you review everything that they provided, it's clear that the damages posited to the jury . . . can't support the argument that these would be damages covered under our insurance policy[.]").  Rockhill relies on its motion for judgment as a matter of law made under Rule 50(a), R. Doc. 252, and its "renewed" motion for judgment as a matter of law citing Rule 50(b), R. Doc. 254.

But there is a problem with Rockhill's argument.  Both motions were filed before the case was sent to the jury.  In other words, Rockhill only moved for judgment as a matter of law under Rule 50(a)—it never renewed its motion after the verdict under Rule 50(b).  It thus did not preserve its challenge to the denial of its Rule 50(a) motion.  See Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., 993 F.3d 1299, 1303 (11th Cir. 2021) ("If a party makes an unsuccessful Rule 50(a) motion during trial, it must file a Rule 50(b) motion to preserve the issue for appeal.").  Rockhill's failure to comply with Rule 50(b) therefore forecloses its challenge to the sufficiency of the evidence.  Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 546 U.S. 394, 403–05, 126 S. Ct. 980, 987–88 (2006) (citing, inter alia, Cone v. W. Va. Pulp & Paper Co., 330 U.S. 212, 217–18, 67 S. Ct. 752, 755–56 (1947)).

21

## IV.  THE ASSOCIATION'S CROSS-APPEAL

As a preliminary matter, we must distinguish between the two rulings from which the Association appeals.  The Association argues that the District Court erred by denying both its Rule 50(b) motion—which we review de novo—and its Rule 59(e) motion—which we review for abuse of discretion.  As described above, the Association repeated verbatim its preexisting damages and hurricane deductible arguments in each motion.  Thus, the Association used its Rule 59(e) motion to "relitigate old matters" and argue about evidence that could have been—and was—raised prior to the entry of judgment.  Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007) (quotation marks omitted).  Because this Court expressly forbids parties from doing exactly that, and because the Association has not even attempted to demonstrate "there is newly-discovered evidence or manifest errors of law or fact," we affirm the District Court's denial of the Association's Rule 59(e) motion, see Metlife Life & Annuity Co. of Conn. v. Akpele, 886 F.3d 998, 1008 (11th Cir. 2018), and address the arguments under Rule 50(b)'s de novo standard of review.

## A. THE EVIDENCE IS SUFFICIENT TO SUPPORT THE JURY'S PREEXISTING DAMAGE FINDING

On appeal the Association argues the District Court's denial of its Rule 50 motion was improper because "[t]here was no basis in the evidence to support the jury's finding that damage in the amount of $359,578 represented the dollar amount of damage that was not caused by Hurricane Irma."  The Association

22

admits that Ms. Pardee testified about poor waterproofing on the balconies, but argues that her testimony provided no link between the waterproofing of all of the exterior glass and any preexisting condition. Additionally, the Association argues the $359,578 line item in Mr. Torres's estimate (which matches the amount found by the jury) reflected the cost of waterproofing independent from any preexisting problem—it was caulking to be done after the windows were replaced.

Judgment as a matter of law is appropriate when a party "presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element" of his affirmative defense. See Williams v. First Advantage LNS Screening Sols. Inc., 947 F.3d 735, 744 (11th Cir. 2020) (quotation marks omitted). Here, the jury was instructed that Rockhill had to prove two elements for its preexisting damages affirmative defense:

> Even if St. Louis proves its claim by the greater weight of the evidence Rockhill Insurance can prevail if Rockhill proves by the greater weight of the evidence that, one, the damages which St. Louis claims already existed at the time of loss such that the damage was not caused by Hurricane Irma. And two, the dollar amount of such pre-existing damage.

To determine if the evidence was sufficient to establish these elements, we draw all reasonable inferences in favor of Rockhill and disregard all evidence favorable to the Association that the jury is not required to believe. Akouri v. State of Fla. Dep't of Transp., 408 F.3d 1338, 1343 (11th Cir. 2005). That means that we give

23

credence to the evidence supporting Rockhill "that is uncontradicted and unimpeached." Id. (quotation marks omitted).

Based on the evidence introduced at trial, we can reasonably infer that the jury's finding of $359,578 in preexisting damages was for the "waterproofing" line item in Mr. Torres's estimate for the same amount. Rockhill presented evidence from Mr. Davis, who testified that he observed water intrusion from Hurricane Irma, but it was limited to "water from upper balconies that were leaking to the living room ceiling of the unit below." He said the concrete balconies "did not have a good water-proofing system." In addition, Ms. Pardee testified that there was damage to some balconies that "appears to be water damage from water entering the stucco and damaging the paint." She explained that the balconies were cracking at the joints because "moisture . . . enter[s] the walls and that moisture seeks a way out" through crack and paint. That problem is then aggravated, she said, by continued moisture exposure so that every time it rains the problem will exacerbate. Ms. Pardee believed this problem was attributable to the lack of waterproofing on the balconies. This specific damage is the damage she said predated Hurricane Irma.

There is also testimony that before Hurricane Irma, the Association planned to use a special assessment for "beautification" to, among other things, make stucco repairs and paint and waterproof the balconies. Ms. Del Castillo testified

24

that upkeeping the exterior of the building was important, so that is why they chose to put a special assessment through to complete that work. Ms. Del Castillo was also asked about one particular set of the board of directors' meeting minutes from 2015, which listed "[p]ainting water proofing and balconies" as a project update and referenced a proposal for $1.2 million. In closing, Rockhill argued that the Association was using this $1.2 million beautification project to hide its preexisting damages.

This evidence is sufficient to support the jury's decision. The standard is whether there is "any" legally sufficient basis for a reasonable jury to find in Rockhill's favor. Advanced Bodycare Sols., LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1360 (11th Cir. 2010). The number found by the jury was not pulled out of a hat—it was within the range shown by the evidence at trial. See United States v. Sullivan, 1 F.3d 1191, 1196 (11th Cir. 1993) ("[T]he jury enjoys substantial discretion in awarding damages within the range shown by the evidence[.]"). We can reasonably infer that, from the testimony about the preexisting damage caused by the lack of waterproofing, the waterproofing line item in Mr. Torres's estimate was to repair preexisting damage. See id. ("[W]hile the jury may not pull figures out of a hat, its verdict does not fail for a lack of exhaustive or dispositive evidence so long as a rational basis exists for the calculation.").

25

B. ROCKHILL'S FAILURE TO COMPLY WITH FLORIDA STATUTE
   § 627.701(2) DOES NOT RENDER THE HURRICANE DEDUCTIBLE
   UNENFORCEABLE

The Association argues that the Policy's 3% hurricane deductible is unenforceable because Rockhill failed to obtain approval from Florida's Office of Insurance Regulation under Fla. Stat. § 627.701(2).  The Association relies on the text of § 627.701, which says that "[u]nless the office [of insurance regulation] determines that the deductible provision is clear and unambiguous, a property insurer may not issue an insurance policy" covering real property that contains a hurricane deductible provision and sets forth the deductible "as a percentage rather than as a specific amount of money."  Fla. Stat. § 627.701(2) (emphasis added).

As the Association points out, the violation of certain subsections of § 627.701 does not result in any penalty.  See, e.g., Fla. Stat. § 627.701(3)(a) (stating that the failure to provide notice of offers of alternative deductible amounts does not affect the coverage provided under the policy); QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc., 94 So. 3d 541, 554 (Fla. 2012) (holding that failure to comply with the language and type-size requirements in § 627.701(4)(a) does not render a hurricane deductible provision void).  Based on the Florida Supreme Court's analysis in Chalfonte, we hold that Rockhill's failure to

obtain approval of its percentage-deductible under § 627.701(2) does not render the deductible unenforceable.[9]

In Chalfonte, the Florida Supreme Court answered several questions certified to it by this Court, including whether an insurer's failure to comply with the language and type-size requirements established by Fla. Stat. § 627.701(4)(a) render a noncompliant hurricane deductible provision void and unenforceable. See 94 So. 3d at 543, 545. Unlike many other sections of Florida's Insurance Code, § 627.701(4)(a) did not specify any penalty or consequence for the insurer's failure to comply. Fla. Stat. § 627.701(4)(a); see also Chalfonte, 94 So. 3d at 552–53. The Florida Supreme Court thus held that in the absence of an express, legislatively-created penalty, the court could not provide a remedy for the insurer's noncompliance. See id. at 553. The same logic applies here. The Florida legislature did not specify any penalty or consequence for failing to comply with § 627.701(2), so we are "not at liberty to supply one." Id. at 553 (quotation marks omitted).

---

[9] Rockhill says there is nothing for us to review because the Association did not raise the arguments it is making on appeal before the District Court. True, the Association did not specifically argue that Florida's legislature intended § 627.701(2) to void policy provisions as the sanction for an insurer's failure to comply with that subsection. But because the Association argued that the 3% hurricane deductible violates § 627.701(2) and should not be enforced, we think the argument is sufficiently before us.

The Association's reliance on United States Fire Insurance Company v. Roberts, 541 So. 2d 1297 (Fla. 1st DCA 1989) (per curiam), is unpersuasive. In Roberts, the First District held that a policy's coinsurance provision was void because it did not comply with § 627.701(1). The Roberts court looked to the history of § 627.701(1), which, before it was amended in 1982, specifically stated that "any such clause or provision shall be null and void, and of no effect" unless it complied with the coinsurance provision. See 541 So. 2d at 1298–99 (quoting Fla. Stat. § 627.701 (1981)). The First District did not apply the general rule that the legislature intends an amended statute to have a different meaning than its pre-amendment version, noting that the legislature intended to clarify—not substantively change—the statute. Id. at 1299.

In deciding the enforceability of § 627.701(4)(a) in Chalfonte, the Florida Supreme Court found the legislative history distinguishable. Chalfonte, 94 So. 3d at 554. Section 627.701(4)(a), unlike § 627.701(1), "had never included" an express penalty provision. Id.; Roberts, 541 So. 2d at 1299 ("As can be seen from the 1983 version, there is no express statement that the coinsurance clause is null and void if the requisite statement is not stamped on the face of the policy."). So too here with § 627.701(2). Ch. 93-410, 1993 Fla. Laws 37. Thus, this case falls squarely within the Chalfonte analysis.

As the Florida Supreme Court has recognized, voiding an exclusion to insurance coverage "is a severe penalty" that alters the terms of the parties' deal— it "requires the insurer to provide coverage for uncontracted risk, coverage for which the insured has not paid." Chalfonte, 94 So. 3d at 554 (quotation marks omitted). Without indication from the Florida legislature that violating § 627.701(2) voids the offending deductible provision, we will not impose such a penalty here.

## V. CONCLUSION

After extensive litigation, we put this case to bed. The jury's verdict in favor of the Association, and the District Court's orders adjusting the amount of damages awarded, are **AFFIRMED**.