[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14168
_____

D.C. Docket No. 2:10-cv-02847-IPJ

LOCAL 703, I.B. OF T. GROCERY & FOOD
EMPLOYEES WELFARE FUND,
individually and on behalf of all others similarly situated,
EMPLOYEES' RETIREMENT SYSTEM OF
THE VIRGIN ISLANDS,
Lead Plaintiff, et al.,

Plaintiffs-Appellees,

PLAINTIFFS' LIAISON COUNSEL,

Plaintiff,

versus

REGIONS FINANCIAL CORPORATION,
C. DOWD RITTER, et al.,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(August 6, 2014)

Before PRYOR and MARTIN, Circuit Judges, and HONEYWELL,[*] District Judge.

MARTIN, Circuit Judge:

Regions Financial Corporation and the individual defendants (collectively, "Regions") appeal from the District Court's decision to certify a class action based on alleged misrepresentations about Regions's financial health before and during the recent economic recession.  Regions argues that the District Court should not have certified the class, and that the class period is not justified.  After careful review, and with the benefit of oral argument, we affirm the District Court's well-reasoned order in nearly all respects.  But we vacate and remand for further proceedings in light of Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II), ___ U.S. ___, 134 S. Ct. 2398 (2014), to allow consideration of Regions's evidence of price impact and for the District Court to review the duration of the class period.

## I. BACKGROUND

According to the plaintiffs' amended complaint, Regions made a series of misrepresentations beginning in 2008, in statements to analysts as well as required financial disclosures, about the value of its assets and its financial stability.  More specifically, the plaintiffs allege that Regions—which was heavily invested in the

---

[*] Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

2

real estate market—manipulated the way unhealthy assets were carried on its books to avoid disclosing significant losses that would compromise the company's value.  Plaintiffs also allege that senior executives, with full knowledge of Regions's impaired and unstable asset portfolio, repeatedly underreported losses and represented that the company was in good financial health.  Plaintiffs say that the failure to accurately represent the company's financial situation resulted in artificially high stock prices for Regions, and allowed it to avoid the precipitous decline of its stock price that would have resulted during the recession, absent the misleading disclosures.  On January 20, 2009 Regions made a substantial corrective disclosure, reporting $5.6 billion in losses.  That same day, Regions stock traded at $4.60 per share, compared to $23 per share on the first day of the proposed class period.

The plaintiffs moved to certify a class comprised of all investors who purchased Regions stock from February 27, 2008, when Regions filed its first allegedly misleading financial disclosure, through January 19, 2009, the last trading day before the corrective disclosure.  The District Court found that the proposed class satisfied all the prerequisites for certification under Federal Rule of Civil Procedure 23(a): the class is sufficiently numerous, there are questions of law or fact common to the class, the named representatives have claims and are subject to defenses typical of the class, and the representatives will fairly and adequately

3

protect the class interests.  The District Court allowed the class to proceed under Rule 23(b)(3), finding that common questions of law or fact would predominate over individual questions.  Based on these findings, the Court certified the class for the period from February 27, 2008 to January 20, 2009.

Regions argues here that the District Court should not have certified the class because (1) the plaintiffs did not prove that common questions about reliance, a required element in securities actions, would predominate over individual ones; (2) the District Court should have conducted an evidentiary hearing on the expert evidence supporting the conclusion that common questions predominate; (3) Regions offered sufficient evidence to rebut the finding of class-wide reliance; (4) the named representatives are not typical; and (5) the period over which the class is certified is not justified.[1]

## II. STANDARD OF REVIEW

We review a District Court's decision about whether to certify a class for an abuse of discretion.  E.g., Babineau v. Fed. Express Corp., 576 F.3d 1183, 1189

---

[1] Regions also argued, for the first time in supplementary briefing, that class certification is inappropriate because, in its view, the plaintiffs did not demonstrate that damages are susceptible to class-wide proof.  Regions believes such proof is required by Comcast Corp. v. Behrend, ___ U.S. ___, 133 S. Ct. 1426 (2013).  It is not appropriate for us to pass on that issue now because Regions did not challenge the class certification on this basis in the District Court. Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1330–35 (11th Cir. 2004) (noting that this Court will hear an argument raised for the first time on appeal in limited circumstances, which do not apply in this case); see also United States v. Levy, 416 F.3d 1273, 1275–76, 1280 (11th Cir. 2005) (per curiam) (describing this Court's general rule that arguments not raised in the opening brief are waived).

(11th Cir. 2009).  We will only find an abuse of discretion if the District Court applies the wrong legal standard, follows improper procedures in making its determination, bases its decision on clearly erroneous findings of fact, or applies the law in an unreasonable or incorrect manner.  Klay v. Humana, Inc., 382 F.3d 1241, 1251 (11th Cir. 2004), abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131 (2008).

### III. CLASS-WIDE RELIANCE

### A. The Basic Presumption

To certify a class under Rule 23(b)(3), the District Court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  "Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action."  Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I), ___ U.S. ___, 131 S. Ct. 2179, 2184 (2011).  The elements of a private securities fraud claim are (1) material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a company's stock; (4) reliance on the misrepresentation; (5) economic loss; and (6) loss causation.  Id.  "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance."  Id.  This case is no exception.

"The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." Id. at 2185. However, the Supreme Court has recognized that requiring such direct proof of reliance in every case "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." Basic Inc. v. Levinson, 485 U.S. 224, 245, 108 S. Ct. 978, 990 (1988). And because it would be difficult for individual investors to prove reliance, the requirement of individualized proof would have the practical effect of preventing plaintiffs from bringing class actions in securities cases. Id. at 242, 108 S. Ct. at 989; see also Halliburton I, 131 S. Ct. at 2185.

The Supreme Court established what we now call the Basic presumption to alleviate these concerns. Halliburton I, 131 S. Ct. at 2185. Under the Basic presumption, plaintiffs may benefit from a rebuttable presumption of class-wide reliance "based on what is known as the fraud-on-the-market theory." Id. (quotation marks omitted). "According to that theory, the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Id. (quotation marks omitted). The theory thus allows us to presume "that an investor relies on public misstatements

6

whenever he buys or sells stock at the price set by the market." Id. (quotation marks omitted).

But the mere purchase of stocks at a price set by the market does not permit plaintiffs to take advantage of Basic's rebuttable presumption of reliance. It is well settled that "plaintiffs must prove certain things in order to invoke" that presumption. Id. "It is common ground, for example, that plaintiffs must demonstrate that the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." Id. (quotation marks omitted).

The District Court found that these plaintiffs justified invocation of the Basic presumption. Regions argues that this finding was erroneous because the evidence was insufficient to conclude that its stock traded on an efficient market. To that end, Regions makes three arguments: (1) that the District Court should have, but failed to, apply the analytical framework for analyzing market efficiency set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989);[2] (2) that at the very least,

---

[2] The Cammer factors are: (1) high average trading volume during the class period; (2) a significant number of analysts following the stock; (3) numerous market makers who react quickly to, and trade based upon, new information about the company; (4) entitlement to file a Securities and Exchange Commission (SEC) Form S-3, which has minimum stock and trading requirements; and (5) empirical facts showing a cause and effect relationship between unexpected corporate events and an immediate response in the stock price. 711 F. Supp. at 1286–87.

the District Court should have required the plaintiffs to offer evidence that the misrepresentations caused an immediate change in the stock price;[3] and (3) that these analytical shortcomings contributed to the erroneous application of a per se rule that the market for every stock listed on a national exchange trades on an efficient market. None of these arguments compel a result different from that reached by the District Court. The trial judge properly applied the established law of our Circuit to analyze the efficiency of the market for Regions stock.

## B. Analyzing Market Efficiency

Regions complains that this Court has not established a comprehensive analytical framework for determining whether the market for a particular stock is efficient. Regions is right that we have not adopted any sort of mandatory analytical framework. But we do not see this as a problem. By not setting forth a mandatory framework, we have given District Courts the flexibility to make the fact-intensive inquiry on a case-by-case basis. Beyond that, the flexible approach will allow District Courts in the future to consider new factors yet unknown to this Court that market theorists might consider to indicate market efficiency.

At the same time, our more flexible approach of leaving the analysis in the capable hands of District Courts by no means implies that we have given no

---

[3] In light of the intervening case Amgen Inc. v. Connecticut Retirement Plans & Trust Funds, ___ U.S. ___, 133 S. Ct. 1184 (2013), Regions has wisely retreated from its initial position that certification was inappropriate because the plaintiffs did not show that the misrepresentations were material.

guidance. Quite the contrary, we identified some major, general characteristics of an efficient market in FindWhat Investor Group v. FindWhat.com, 658 F.3d 1282, 1310 (11th Cir. 2011). There, we said that the market for a stock is generally efficient when "millions of shares change hands daily and a critical mass of" investors and/or analysts who "study the available information and influence the stock price through trades and recommendations."[4] Id. (alteration and quotation marks omitted). So, quite contrary to Regions's position on appeal that we have yet to specify factors relevant to the market efficiency inquiry, we have indeed defined some features of an efficient market: high-volume trading activity facilitated by people who analyze information about the stock or who make trades based upon that information. These are factors District Courts therefore know to look for when analyzing the markets for securities of established companies like Regions. However, even these general signs of an efficient market may not be required for a finding of an efficient market in every case. Stocks that trade on a smaller scale, or that are not widely followed, might trade on an efficient market. It is up to the District Courts to consider the nature of the market on a case-by-case

---

[4] FindWhat makes reference to "market makers" instead of active investors. 658 F.3d at 1310. "A 'market maker' is one who helps establish a market for securities by reporting bid-and-asked quotations." Sec. & Exch. Comm'n v. Diversified Corporate Consulting Grp., 378 F.3d 1219, 1222 n.7 (11th Cir. 2004) (alteration and quotation marks omitted). Unlike the NASDAQ, the national exchange FindWhat's stock traded on, FindWhat, 658 F.3d at 1293 n.5, it appears the NYSE does not use market makers in the same way, according to the record in our case. In our view, informed investors closely watching the value of their investments generally serve as a good proxy for market makers for those trading platforms that do not or did not rely on them to facilitate trades in the way alluded to in FindWhat.

basis to decide whether the totality of the circumstances supports a finding of market efficiency.

We reject Regions's suggestion that we adopt the Cammer factors as the mandatory analytical framework for market efficiency inquiries. Of course, we recognize that a number of our sister Circuits have approved the use of those factors when appropriate. See In re DVI, Inc. Sec. Litig., 639 F.3d 623, 634 n.16 (3d Cir. 2011) (noting that seven of the twelve Circuit Courts have done so). And we certainly do not suggest that a District Court would be wrong to rely on the Cammer factors to guide its analysis. Indeed, some of those factors might prove particularly useful when a District Court considers a stock for which the more traditional indicia of efficiency set out in FindWhat are not present.

But we do not think it wise to require District Courts to analyze market efficiency in terms of the Cammer factors in every case. Apparently, neither do many of our sister Circuits that have applied those factors in their own cases. See In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 18 (1st Cir. 2005) ("While we agree . . . that the [Cammer] factors considered by the district court were relevant to the issue of market efficiency, these factors are not exhaustive."); In re DVI, 639 F.3d at 634 n.16 ("We have noted the Cammer factors may be instructive depending on the circumstances."); Gariety v. Grant Thornton, LLP, 368 F.3d 356, 368 (4th Cir. 2004) (citing Cammer for the proposition that, "to determine whether

10

a security trades on an efficient market, a court should consider factors such as, among others, whether the security is actively traded, the volume of trades, and the extent to which it is followed by market professionals"); Unger v. Amedisys Inc., 401 F.3d 316, 323 (5th Cir. 2005) ("[T]his list [of eight factors, including the five Cammer factors,] does not represent an exhaustive list, and in some cases one of the above factors may be unnecessary . . . ."). As the law stands, District Courts have a good idea of what they should be looking for in determining market efficiency, as well as the flexibility to do that analysis in the most sensible way given the circumstances. We see no reason to upset the balance.

Neither are we persuaded by Regions's argument that a finding of market efficiency always requires proof that the alleged misrepresentations had an immediate effect on the stock price. Although many Circuit Courts have described cause-and-effect as the most important of the Cammer factors, see, e.g., Teamsters Local 445 Freight Div. Pension, Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008), Regions does not point us to any court that has adopted the unwavering evidentiary requirement it urges upon us. Nor could it. Even the Cammer court itself did not establish such a strict evidentiary burden at the class certification stage. 711 F. Supp. at 1287 (noting that proof of the cause-and-effect factor "would be helpful" to the efficiency analysis). This case presents a perfect

11

example of why an inflexible requirement would run contrary to the market principles that motivated the decision in Basic.

The plaintiffs have alleged here that Regions made a number of confirmatory misrepresentations during the class period. Confirmatory misrepresentations "confirm" existing information about a stock, rather than release new and different information that might bring about a negative change in the stock's price.[5] In other words, Regions's disclosures were designed to prevent a more precipitous decline in the stock's price, not bring about any change to it. When a company releases expected information, truthful or otherwise, the efficient market hypothesis underlying Basic predicts that the disclosure will cause no significant change in the price. See FindWhat, 658 F.3d at 1310 ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price. This is so because the market has already digested that information and incorporated it into the price."); see also Cammer, 711 F. Supp. at 1287 (noting

_____

[5] Regions argues that the District Court erroneously applied the legal standard from Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S. Ct. 1456 (1972), which governs reliance in cases alleging material omissions rather than affirmative misrepresentations. The District Court wisely accepted the plaintiffs' argument that a confirmatory misrepresentation is like an omission, because it is an affirmative representation that omits negative information. Thus, like we do here, the District Court noted that this type of misrepresentation would likely yield price stability rather than volatility, just as we would expect with a traditional omission. All the District Court did in this case was recognize the similarity between two different but closely related factual scenarios and draw on precedent from both areas to render its decision. The District Court's decision to do so evidences good, reasoned judging, not an abuse of discretion.

that the cause-and-effect factor looks to the relationship "between <u>unexpected</u> corporate events or financial releases and an immediate response in the stock price" (emphasis added)).  Requiring plaintiffs to present evidence that the alleged misrepresentations immediately moved the market price in these circumstances would thus place an evidentiary burden upon them which is, at best, elusive.

Neither would it make sense to impose an unwavering requirement for plaintiffs to identify unexpected disclosures during or around the class period that had an immediate price impact.  In any given case there may be no unexpected disclosures during the period at all, because the company is withholding that information.  To require plaintiffs to prove a set number of unexpected disclosures resulting in an immediate price impact would rob District Courts of the flexibility they need to conduct holistic, fact-sensitive inquiries into the efficiency of the market for the particular stock before it.  The plaintiffs in this case did identify one unexpected disclosure around the class period—a corrective disclosure on January 20, 2009, which had an immediate negative impact on the stock price.  On this record, the District Court did not abuse its discretion when it refused to require the plaintiffs to identify more instances of unexpected disclosures and a resulting price impact before finding the initial burden under <u>Basic</u> satisfied.[6]

---

[6] We are aware that the Fifth Circuit has criticized a District Court for accepting the cause-and-effect factor as proven based on only three instances of unexpected disclosures resulting in a price impact.  <u>Unger</u>, 401 F.3d at 324–25.  But the Fifth Circuit did not purport to

Finally, we turn to Regions's accusation that the District Court applied an improper, per se rule that stocks trading on a national exchange always trade on efficient markets. Another member of our Court has recognized that securities trading on national exchanges like the NYSE "are often presumed to be traded on an efficient market," see Thompson v. RelationServe Media, Inc., 610 F.3d 628, 693–94 (11th Cir. 1010) (Tjoflat, J., concurring in part and dissenting in part), precisely because the exchanges are generally populated by stocks that are closely watched by analysts and that trade at a high volume. See In re DVI, 639 F.3d at 634 ("[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency."). Nevertheless, we share Regions's resistance to a per se rule of market efficiency for all stocks that trade on a national exchange, without regard for the particular characteristics of that stock. See Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 313–14 (5th Cir. 2005) ("[S]ome companies listed on national stock exchanges are relatively unknown and trade there only because they met the eligibility requirements. While the particular market for stock trades might be relevant, it is not dispositive of whether the current price reflects all available information, which, of course, is the

---

adopt a minimum requirement, and instead cautioned District Courts that the Cammer factors are no more than an "analytical tool" that must be applied in ways sensitive to the particulars of the case before it. See id. at 325. Beyond that, the misrepresentations alleged in Unger were not the sort of confirmatory misrepresentations we have here. Instead, they were affirmative misrepresentations of profits above what the market would otherwise expect. See id. at 319–20.

hallmark of an efficient capital market." (quotation marks and citations omitted)).

Thus, although trading on a national exchange may be relevant to the inquiry,

District Courts should remain focused on the market for the particular stock before

them, as FindWhat suggests.

At the same time, we do not share Regions's view that the District Court

applied a per se rule in this case, notwithstanding the language in the order that

might suggest otherwise. The District Court did recognize that not all securities

trading on the NYSE necessarily trade on an efficient market, noting only that the

market could be presumed efficient for "virtually" all securities traded there. And

the District Court said it applied FindWhat to the particular circumstances of the

market for Regions stock, not any sort of per se rule. As the District Court's

opinion notes, "millions of shares of [Regions] stock are traded on the New York

Stock Exchange daily," a high trading volume that strongly suggests an efficient

market. See FindWhat, 658 F.3d at 1310. Unfortunately, the District Court's

order does not point to the other factors in the record that lend even more

credibility to its market efficiency finding. For example, 29 financial analysts

covered Regions stock over the class period. Regions was eligible to file an SEC

Form S-3, one of the Cammer factors. Cammer, 711 F. Supp. at 1286. And the

number of institutional investors holding Regions stock during the class period

ranged from 329 to 425. Cf. In re Xcelera.com Sec. Litig., 430 F.3d 503, 512, 515

(1st Cir. 2005) (indicating that the presence of institutional investors can contribute to a market efficiency finding).

Surely these are the types of facts the District Court had in mind when it said it was "[a]pplying FindWhat to the facts here." Certainly these facts undermine Regions's claim that the District Court applied a strict per se rule of market efficiency for all stocks trading on national exchanges. In any event, even if the District Court did engage in an improper presumption without considering the specific trading characteristics of Regions stock, the evidence before the District Court supports a finding of market efficiency in light of FindWhat. See Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 716 (11th Cir. 2012) ("Despite the District Court's error, we may affirm for any reason supported by the record."). We therefore affirm the District Court's determination that the plaintiffs justified application of the Basic presumption.[7]

---

[7] Regions also complains that the District Court violated Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), by relying on expert testimony despite Regions's motion to strike and request for a hearing. The District Court only relied on the challenged expert testimony in deciding materiality issues. Given Regions's concession that Amgen precludes consideration of materiality at the class certification stage, the Daubert argument is moot in this respect. And because the District Court did not rely on the challenged expert evidence to resolve any other issue, there was no need to engage the Daubert analysis before resolving the class certification motion. See Am. Honda Motor Co. v. Allen, 600 F.3d 813, 815–16 (7th Cir. 2010) (per curiam) ("We hold that when an expert's report or testimony is critical to class certification, . . . the district court must perform a full Daubert analysis before certifying the class . . . ."). Neither have we considered the challenged expert evidence in resolving Regions's appeal.

## IV. REBUTTING THE PRESUMPTION

The Basic inquiry does not end once the presumption of class-wide reliance has been invoked.  As the Supreme Court recently held, defendants may introduce price impact evidence both to undermine the plaintiff's case for market efficiency and to rebut the Basic presumption once it has been established.  Halliburton II, 134 S. Ct. at 2414–16.  Regions presented evidence that its stock price did not change in the wake of any of the alleged misrepresentations.  The District Court, relying on the state of the law before Halliburton II, did not fully consider this evidence.  The plaintiffs apparently agree, urging us to "remand for fuller consideration by the district court of all the price-impact evidence submitted below."

In keeping with the suggestion of both parties that the analysis of Regions's case rebutting the Basic presumption should be reconsidered in light of Halliburton II, we remand to the District Court to undertake that review.  But we are mindful, and the District Court is no doubt aware, that its work on remand will be limited in scope.  The Supreme Court only said that defendants "may seek to defeat the Basic presumption" with evidence that the misrepresentations did not impact the price. Id. at 2417 (emphasis added).  Halliburton II by no means holds that in every case in which such evidence is presented, the presumption will always be defeated. Indeed, this Court has recognized the distinct role that confirmatory information

17

may have in this analysis.  See FindWhat, 658 F.3d at 1310 ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information—or information already known by the market—will not cause a change in the stock price.  This is so because the market has already digested that information and incorporated it into the price.").  But in any event, because the District Court is in the best position to review all the facts and conduct the inquiry now required in the wake of Halliburton II, we vacate and remand this case for that purpose.

## V. TYPICALITY OF THE REPRESENTATIVES

Regions next argues that the lead plaintiffs, District No. 9, I.A. of M. & A.W. Pension Trust (District 9) and Employees' Retirement System of the Virgin Islands (Virgin Islands), are not proper class representatives because their claims are not typical, as Federal Rule of Procedure 23(a) requires.  Regions argues that District 9 is not typical because (1) it benefitted from the alleged misrepresentations by selling some of its Regions stock at inflated prices during the class period; and (2) it purchased many shares of Regions stock following the corrective disclosure.  The Virgin Islands also is not typical, in Regions's view, because (1) it retained its Regions holdings long after the corrective disclosure; and (2) it purchased its shares late in the class period.  Regions also argues that both are atypical because they ceded investment authority to outside managers.

18

"The typicality requirement may be satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories." Williams v. Mohawk Indus., Inc., 568 F.3d 1350, 1357 (11th Cir. 2009) (quotation marks omitted).  After careful consideration of Regions's arguments, we find that the District Court did not abuse its discretion by finding that both lead plaintiffs meet the typicality requirement.

That District 9 benefitted to some extent from the alleged fraud by selling some of its shares during the class period makes no difference here.  There is no evidence that District 9 may be subject to an in pari delicto defense because it is equally at fault for the misrepresentations.  See Pinter v. Dahl, 486 U.S. 622, 633, 108 S. Ct. 2063, 2071 (1988).  And while some District Courts have found that an investor who suffers no net losses thanks to sales during the class period is subject to an atypical standing defense, see, e.g., In re Comdisco Sec. Litig., 150 F. Supp. 2d 943, 945–46 (N.D. Ill. 2001), those cases are inapposite here.  District 9 did suffer net losses from its purchases of Regions stock, despite some sales during the class period.  The evidence shows that District 9 spent about $933,000 on the 64,500 Regions shares it acquired over the class period, compared to its sale of 25,900 shares over the same period for about $256,000.  Regions has not pointed us to any evidence suggesting that District 9's gains during the period might

arguably offset its losses under any generally accepted accounting method. Its argument that District 9's sales render it atypical is thus misguided.

Neither are we persuaded by Regions's argument that District 9's post-disclosure purchases render it atypical. We agree with our colleagues from the Fifth Circuit that "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market." Feder v. Elec. Data Sys. Corp., 429 F.3d 125, 138 (5th Cir. 2005). This is particularly true where, as here, the post-period purchases are made "after the stock price has been 'corrected' by the market's assimilation of the new information." Id. Regions's briefing does not identify any unique circumstances in this case that should have persuaded the District Court to deviate from this general rule. We therefore adhere to it.

That the Virgin Islands purchased its shares late in the class period presents no reason to consider the District Court's finding of typicality to be an abuse of discretion. FindWhat, 658 F.3d at 1315 ("Every investor who purchases at an inflated price—whether at the beginning, middle, or end of the inflationary period—is at risk of losing the inflationary component of his investment when the truth underlying the misrepresentation comes to light."). Neither does the Virgin Islands's retention of its shares long after the corrective disclosure. There is merit to Regions's argument that "the longer the time between the purchase and sale, . . .

20

the more likely that other factors [besides the misrepresentations] caused the loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 343, 125 S. Ct. 1627, 1632 (2005). Nevertheless, the District Court's determination on this record that the Virgin Islands would not likely be subject to an atypical defense for that reason does not amount to an abuse of discretion.[8]

Finally, neither representative's use of investment advisers warrants reversal. Certainly, a large institutional investor is likely to rely on investment advisers to make investment decisions on its behalf. And yet both Congress and the courts have recognized that these sorts of investors are generally preferred as class representatives in securities litigation. See, e.g., 15 U.S.C. § 77z-1(a)(3)(B)(iii)(I) (directing courts to "adopt a presumption that the most adequate [lead] plaintiff in any private [securities] action arising under this subchapter is the person or group of persons that . . . in the determination of the court, has the largest financial interest in the relief sought by the class"); In re DVI, 639 F.3d at 641 ("[S]ophisticated institutional investors . . . are preferred as class representatives."); see also id. at 640 n.25 (acknowledging, while addressing a different topic, that institutional investors are likely to use outside advisors). Even sophisticated investment advisers (like those involved in this case) rely on the

---

[8] Of course, if the circumstances have changed since the District Court's June 2012 certification order such that the representatives are no longer typical or adequate, the District Court may revisit its initial certification decision. See Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 2372 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation.").

integrity of the market.  This is true even if they do not incorporate particular informational disclosures into their investment strategies.  Blackie v. Barrack, 524 F.2d 891, 907 (9th Cir. 1975) ("A purchaser on the stock exchanges may be either unaware of a specific false representation, or may not directly rely on it; he may purchase because of a favorable price trend, price earnings ratio, or some other factor.  Nevertheless, he relies generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price, and thus indirectly on the truth of the representations underlying the stock price whether he is aware of it or not, the price he pays reflects material misrepresentations.").

Given all these facts, we cannot conclude that the District Court's typicality finding constituted an abuse of its discretion.

## VI. CLASS PERIOD

Finally, Regions complains about the duration of the class period.  It argues that the class period cannot begin with the filing of the Form 10-K reflecting Regions's financial data for fiscal year 2007 because the plaintiffs do not allege any wrongdoing in 2007.[9]  This argument misunderstands the plaintiffs' allegations.  These plaintiffs have alleged that the Form 10-K filed on February 27,

---

[9] Regions's broader argument that there is no evidence of wrongdoing during the class period is entirely without merit.  The complaint alleges that Regions fraudulently overvalued its asset portfolio by manipulating loan classifications "throughout 2008, and at least through the first quarter of 2009."

2008 was misrepresentative because it was the first financial disclosure in which Regions should have reported losses based on the 2007 decline of the real estate market. Contrary to Regions's position in this appeal, this theory of liability in no way requires the plaintiffs to allege or prove that any fraud took place in 2007. All of Regions's conduct in 2007 may be perfectly innocent, but if it misrepresented the value of its 2007 assets in 2008, then it would have violated the Securities Exchange Act, and the class period can begin at that time on that basis.

However, Regions's argument about the end date for the period is well taken. The plaintiffs requested the class to include all persons or entities who purchased or otherwise acquired Regions securities "between February 27, 2008 and January 19, 2009." The District Court's certification order, however, included all those who purchased or acquired securities "between February 27, 2008, and January 20, 2009." Based on the record here, individuals who purchased their shares on January 20, 2009 should likely be excluded from the class. This is because Regions's corrective disclosure on January 20 was made before the market opened for trading. We therefore vacate and remand for the District Court to clarify the end date of the class period.

## VII. CONCLUSION

The District Court's holdings regarding the application of the Basic presumption, the typicality of the class representatives, and the start date for the

23

class period are due to be affirmed.  But we vacate and remand for the District Court to reconsider, in light of Halliburton II, whether Regions rebutted the Basic presumption and to clarify the end date of the class period.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**