[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12913

_____

LINDSAY DAVIS,
BENJAMIN DAVIS,

                                    Plaintiffs-Appellees,

*versus*

J. MICHAEL WHITE,
ECO-PRESERVATION SERVICES L.L.C.,
SERMA HOLDINGS LLC,
BUILDER1.COM LLC

                                    Defendants-Appellants,

AKETA MANAGMENT GROUP, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:17-cv-01533-LSC

_____

_____

No. 22-12915

_____

NICOLE SLONE,
JONATHAN SLONE,

Plaintiffs-Appellees,

*versus*

J. MICHAEL WHITE,
ECO-PRESERVATION SERVICES L.L.C.,
SERMA HOLDINGS LLC,
BUILDER1.COM LLC,

Defendants-Appellants,

22-12913                Opinion of the Court                3

AKETA MANAGMENT GROUP, et al.,

                                              Defendants.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 7:17-cv-01534-LSC

_____

_____

No. 22-12916

_____

MONICA LAWRENCE,
JOHN LAWRENCE, JR.,

                                              Plaintiffs-Appellees,

*versus*

J. MICHAEL WHITE,
ECO-PRESERVATION SERVICES L.L.C.,
SERMA HOLDINGS LLC,
BUILDER1.COM LLC,

4                    Opinion of the Court                    22-12913

                                        Defendants-Appellants,


AKETA MANAGMENT GROUP, et al.,


                                                Defendants.


                    _____


                Appeal from the United States District Court
                    for the Northern District of Alabama
                      D.C. Docket No. 7:17-cv-01535-LSC

                    _____


Before WILLIAM PRYOR, Chief Judge, and JORDAN and BRASHER, Circuit Judges.

PER CURIAM:

A sewer company that partnered with and serviced a small town in Alabama imposed hundreds of thousands of dollars in false charges on customer accounts, refused to answer the customers' complaints, shut off their water service, placed liens on their homes, and pursued criminal charges against them. Three affected families sued that sewer company. Their cases were consolidated for trial, and the jury found the sewer company liable for violating the Due Process Clause of the Fourteenth Amendment as well as committing the state law torts of trespass, nuisance, deprivation of property rights, and outrage. The jury's awards in the three cases

total $300,009 in nominal and compensatory damages and $4,443,000 in punitive damages. The defendants appeal the district court's denials of their motions for judgment as a matter of law and for remittitur. We affirm the jury's liability verdicts and leave in place many of the punitive damages awards. We reverse a few of the jury's punitive damages awards that appear to exceed a statutory cap under Alabama law and remand for the district court to modify those awards as appropriate.

## I.

When defendant Michael White developed a subdivision near what is now Lake View, Alabama, he needed to build a sewer system to service that development. White's sewer system comprised multiple entities—one that operated the effluent collection system, one that operated a wastewater treatment plant, one that operated the pipeline that discharged the treated wastewater, and one that handled customer billing and collection. For ease of reading, we simply refer to White and all his entities collectively as "the defendants."

Shortly after the defendants constructed the private sewer system, officials from the Town of Lake View approached them to talk about piping Lake View sewage through their treatment plant and discharge pipeline. The defendants agreed. The Town did not yet have a collection system. The defendants agreed to finance the construction of that system.

As part of the financing arrangement, the Town created the Government Utility Services Corporation. The Town transferred

to this public corporation the rights over the Town's sewer system, including the authority to set rates for sewer services and to collect for services rendered. As part of that transfer, the public corporation had the ability to transfer any unpaid and uncollectable fees to the Town; the Town would reimburse the public corporation for 90 percent of the amounts due. On the same day that the Town-public corporation conveyance took place, the public corporation entered a similar deal with the defendants. The public corporation transferred its assets and rights to the defendants, including the authority to set rates and collect for services rendered. And, when unable to collect amounts due, the defendants could transfer the debts to the public corporation, with the public corporation then becoming responsible for 90 percent of the amounts due.

The public corporation and defendants only became more intertwined over time. The public corporation eventually defaulted on its financial obligations to the defendants. That led to a series of forbearance agreements, one of which contained a concession from the public corporation to the defendants of "sole and exclusive authority to establish Wastewater Standards, Rules, Regulations, Policies, and Procedures for the operation of the" sewer system. In the same board meeting at which that forbearance agreement was ratified, the public corporation also adopted the defendants' wastewater standards "as they exist, and as they may be changed or amended from time to time" by the defendants.

The standards the defendants instituted were harsh, to say the least. If a customer fell behind on payments, the defendants

were empowered to disconnect that customer's water service—even though the defendants did not themselves provide the water service. The defendants would disconnect water by placing a lock on the home's water valve. To effectuate their ability to do that, the defendants and their agents were given a right of entry to all properties serviced by the sewer system, conditioned only on the presentation of credentials before entering the property. If the lock was tampered with or a customer otherwise managed to discharge water into the sewer system, the defendants imposed a penalty of $5,000 per day and reserved the right to press criminal charges. Customers could not make partial payments toward an outstanding balance. And White testified at trial that a customer could dispute a charge only after the customer had paid the disputed amount in full.

This system had the effect of escalating minor billing disagreements into major, life-altering, downward spirals. A customer could quickly find himself under a mountain of debt and without access to water because of the defendants' own mistake. If the defendants erroneously charged a customer's account with fees too large for the customer to pay all at once, the customer would be unable to contest the charge, the customer's water would be shut off, and the charges would keep piling up month to month, making it even less possible for the customer to pay in full to contest the original charge or get access to water. Eventually, the debt would be insurmountable.

This is exactly what the plaintiffs in these consolidated cases said happened to them. Each case involves a married couple who got crosswise with the defendants about their sewer bills.

The first case was brought by Lindsay and Benjamin Davis. The Davises bought a home serviced by the defendants. After they took title, but before they ever moved in, the defendants terminated water services to the home by placing a lock on the water valve. The Davises were given no notice of the termination and did not otherwise authorize the defendants' entry onto their property. For whatever reason, when the Davises did move in, there was no lock on the water valve and the water was on in the home. The defendants said that the Davises must have broken the lock and therefore charged the Davises' account a tampering and illegal discharge fee. The defendants threatened to shut off the water again unless all back dues and penalties were paid. The Davises tried to make partial payments, which were declined. The Davises tried to dispute the payment but were told they could not until their account balance was paid. The Davises' outstanding balance eventually soared to $133,000. The defendants filed a lien on the Davises' home. Throughout the entire ordeal, the Davises felt "hopeless" and worried they would lose their home based on uncontestable fees that were erroneously charged to their sewer account.

The second case was brought by Nicole and Jonathan Slone. While living in a home serviced by the defendants, the Slones decided to move to Kentucky for a few months to look for work. Before moving, they called the defendants to suspend services while

they were gone. The defendants said services would be suspended. Yet, upon their return, the Slones were greeted with a $2,000 sewer bill. When asked about the suspension of services, the defendants informed the Slones that the defendants have an "always-on" policy. The Slones tried to make partial payments, which were rejected, and made inquiries to the defendants about the charges, which were ignored. The defendants eventually terminated the Slones' water service without any prior notice that they would be entering the Slones' property. The Slones had to use water from their pool to flush the toilet, they had to buy bottled water for drinking and cooking, and they had to shower at friends' houses. This period was especially difficult on the Slones' autistic and mute child. After about two weeks, someone (but not the Slones) cut the lock on their water valve. The defendants notified the Slones that they would be incurring additional fees for tampering with the lock and for unauthorized water discharge. Failure to pay would result in a lien on their home and criminal charges, the defendants said. The defendants followed through on both threats—filing a police report against the Slones and a lien on their property. The Slones' sewer bill climbed to $180,000.

The third case was brought by Monica and John Lawrence. Unannounced, the defendants locked the Lawrences' water valve. That same night, Monica broke the lock. The defendants later removed the lock but notified the Lawrences that they were being fined for tampering and illegal discharge. The defendants likewise threatened to (and eventually did) file criminal charges and liens on the home. They rejected partial payment and ignored attempts to

dispute the charges. The looming threat of criminal convictions and foreclosure caused the Lawrences sleepless nights and anxiety. Their sewer bill reached $165,000.

The Davises, the Slones, and the Lawrences sued the defendants in federal court. As relevant here, they alleged that the defendants were state actors and were thus required by the United States Constitution to provide due process before terminating water services or assessing the fees charged in these cases. They also alleged that the defendants' actions constituted trespass, deprivation of property rights, nuisance, and outrage in violation of Alabama law.

The cases were consolidated for trial. The jury found for the Davises and the Lawrences (but not the Slones) on the federal due process claims. The jury found for the Slones and the Lawrences (but not the Davises) on the state law deprivation of property rights claims. The jury found for the Slones and the Lawrences (but not the Davises) on the nuisance claims. The jury found for each couple on the trespass and outrage claims.

Although each individual spouse was a plaintiff in these actions, the verdict forms treated each married couple as a unit and instructed the jury to award damages to each married couple, not each spouse.

The Davises' awards were: $1 in nominal damages and $375,000 in punitive damages on their federal due process claim; $1 in nominal damages and $30,000 in punitive damages on their trespass claim; and $100,000 in compensatory damages and $1,000,000 in punitive damages on their outrage claim.

The Slones' awards were: $1 in nominal damages and $665,000 in punitive damages on their state law deprivation of property rights claim; $1 in nominal damages and $105,500 in punitive damages on their nuisance claim; $1 in nominal damages and $30,000 in punitive damages on their trespass claim; and $100,000 in compensatory damages and $500,000 in punitive damages on their outrage claim.

The Lawrences' awards were: $1 in nominal damages and $450,000 in punitive damages on their federal due process claim; $1 in nominal damages and $702,000 in punitive damages on their state law deprivation of property rights claim; $1 in nominal damages and $55,500 in punitive damages on their nuisance claim; $1 in nominal damages and $30,000 in punitive damages on their trespass claim; and $100,000 in compensatory damages and $500,000 in punitive damages on their outrage claim.

Altogether, the jury awarded $300,009 in nominal and compensatory damages and $4,443,000 in punitive damages. The defendants sought judgment as a matter of law and remittitur. The district court denied those requests. The defendants timely appealed.

## II.

We review *de novo* the denial of a motion for judgment as a matter of law. *St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1242 (11th Cir. 2021). We view the trial record in the light most favorable to the jury's verdict. *Id.* We will reverse only if the facts and inferences drawn from those facts "point

overwhelmingly" against the jury's verdict. *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1309 (11th Cir. 2007) (citation and internal quotation marks omitted).

A denial of a motion for remittitur is reviewed for abuse of discretion. *Goodloe v. Royal Caribbean Cruises, Ltd.*, 1 F.4th 1289, 1292 (11th Cir. 2021). A district court may abuse its discretion by applying the wrong legal standard, following improper procedures, basing its decision on clearly erroneous findings of fact, or applying the law incorrectly. *Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1253 (11th Cir. 2014).

### III.

The defendants launch multiple attacks on the jury's liability verdicts. They ask that we overturn the jury's verdicts on the due process claims because the evidence was insufficient to establish that defendants were state actors and because, even if they were state actors, the plaintiffs were afforded constitutionally sufficient process. They challenge the jury's verdicts on the state law deprivation of property rights claims, asserting no such claim exists under Alabama law. Finally, they say the district court erred in submitting the outrage claim to the jury because the facts here are insufficient to meet the high bar set by the Supreme Court of Alabama's outrage precedents.[1]

---

[1] The defendants also challenge on appeal the jury's liability verdicts as to the state law claims of nuisance and trespass. Those challenges are unpreserved,

### A.

The district court was correct not to disturb the jury's liability verdicts with respect to plaintiffs' federal due process claims brought under 42 U.S.C. § 1983. The Due Process Clause provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court "consistently has held that 'some kind of hearing is required at some time before a person is finally deprived of his property interests.'" *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 16 (1978) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 557–58 (1974)). Accordingly, the Supreme Court has made clear that due process requires an opportunity to contest potential overcharges before a public utility may terminate services. *Id.*

Here, the jury found that the Davises and the Lawrences suffered deprivations without first being afforded the opportunity to contest the accuracy of the defendants' accounts in violation of the Fourteenth Amendment. There was more than enough evidence in the trial record to support those findings. The Lawrences suffered water shutoffs because they had overdue balances on their

---

as the defendants did not raise the issues in their Rule 50(a) Motions for Judgment as a matter of law. *See* Sept. 1, 2021 Trial Tr. at 161:19–168:19 (no discussion of trespass or nuisance claims going to the jury); Sept. 2, 2021 Trial Tr. at 124:20–125:25 (contesting only the evidence in support of mental anguish damages and punitive damages instructions with respect to the trespass claim and implicitly accepting submission of the nuisance charge to the jury). We address the defendants' preserved damages arguments related to those claims later in this opinion.

account; the Davises had false fees assessed against them and their property, which the defendants conceded during trial was sufficient to constitute a deprivation under the Due Process Clause, *see* Sept. 2, 2021 Trial Tr. at 130:14–132:6 (discussing jury instructions). And White's own testimony to the jury was that customers could contest fees only after paying them. *See id.* at 129:18–23; Sept. 1, 2021 Trial Tr. at 223:8–22. Nevertheless, the defendants make two arguments on appeal contesting their liability.

The defendants first argue that they cannot be liable under the Due Process Clause because that clause applies only to government employees or entities, which the defendants are not. True, the defendants are private persons and entities. But a private person or entity is deemed a part of the state when, as the jury found here, "public and private actors place[] themselves into a position of interdependence with each other such that they [are] each joint participants in violating the Plaintiffs' constitutional rights[.]" Jury Instructions at 7; *see also Willis v. Univ. Health Servs., Inc.*, 993 F.2d 837, 840 (11th Cir. 1993). Given the connections between the public and private actors here—e.g., the public corporation's encouragement for and ratification of the defendants' collection policies and efforts, as well as the public corporation's anticipated financial benefit from those efforts—the jury was entitled to find that the defendants were public actors here. *See generally Blum v. Yartesky*, 457 U.S. 991, 1004–05 (1982) (setting out the nexus/joint action test); *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1278 (11th Cir. 2003) (same).

The defendants next contend that, notwithstanding the absence of pre-deprivation procedures, there were post-deprivation opportunities for plaintiffs to contest their fees and correct their accounts. Specifically, the defendants say that plaintiffs could (and should) have instituted arbitration proceedings pursuant to the service agreements or sued in state court under causes of action provided for by Alabama state property and tort law. To be sure, the Supreme Court has recognized that, in certain circumstances, post-deprivation process may be sufficient to satisfy the Due Process Clause. But such situations involve "random and unauthorized" action by government officials such that it would be "impossible" for the government to "predict" that the challenged action would occur and thus "impossible" to provide pre-deprivation process. *See Zinermon v. Burch*, 494 U.S. 113, 129 (1990); *Hudson v. Palmer*, 468 U.S. 517, 532–33 (1984). The deprivations here occurred pursuant to a preformulated policy. And there was evidence of pre-deprivation discussions and strategizing about what steps the defendants would take against the plaintiffs. Furthermore, even after the deprivations, the defendants did not allow any challenges to those actions until the fees had been paid in full. Nothing about the defendants' conduct in these cases was randomized or unpredictable.

*B.*

The district court was likewise correct not to upset the jury's verdicts on the state law claims of "deprivation of property rights" and the tort of outrage.

The defendants argue that Alabama state law does not recognize a "deprivation of property rights" claim. That argument is incorrect. Section 6-5-210 of the Alabama Code creates a "right of action" for "unlawful interference" with the property rights of any "owner of realty with title." Ala. Code § 6-5-210; *see also Willow Lake Residential Ass'n, Inc. v. Juliano*, 80 So. 3d 226, 247–48 (Ala. Civ. App. 2010). An owner "has the right to bring [an] action" under that provision. *Martin v. City of Linden*, 667 So. 2d 732, 736 (Ala. 1995). The defendants also argue that any such claim would be subsumed within the due process claim. They cite no authority for that proposition. And it certainly doesn't appear that the jury considered the claims to be identical, as it ruled for the Davises on due process but against them on deprivation of property rights, and it ruled for the Slones on deprivation of property rights but against them on due process. Those rulings are not inconsistent because the two claims are not the same. They targeted different harms and conduct. *See* Jury Instructions at 6, 12–13.

As for the tort of outrage claim, the defendants say the tort is extremely narrow and that by submitting the claim to the jury on these facts, a federal district court inappropriately expanded state tort common law. We disagree. The facts here are sufficiently analogous to the Supreme Court of Alabama's outrage precedents (and our previous interpretations of those precedents) to have warranted submission to the jury. *See T.R. by and through Brock v. Lamar Cnty. Bd. of Educ.*, 25 F.4th 877, 890–91 (11th Cir. 2022) (noting that the tort of outrage is not limited to the precise "scenarios where the Alabama Supreme Court has found outrage before").

One line of the Supreme Court of Alabama's outrage precedents concerns bad faith and abusive tactics to coerce settlements of insurance disputes. The critical fact in those cases is whether the defendant resorted to such tactics with the intent to cause the plaintiff severe emotional distress and essentially force the plaintiff to settle. *See ITT Specialty Risk Servs., Inc. v. Barr*, 842 So. 2d 638 (Ala. 2002); *Cont'l Cas. Ins. v. McDonald*, 567 So. 2d 1208 (Ala. 1990); *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983). If so, the tort of outrage may be available, so long as the conduct to which the defendant resorted is sufficiently egregious.

Plaintiffs' claims here satisfy the Supreme Court of Alabama's standard for the tort of outrage. As the district court noted when deciding to submit the outrage claims to the jury, the evidence would "clearly" allow for the conclusion that the defendants' conduct—imposing significant false fines and fees, refusing to accept partial payment, declining to entertain disputes to those charges without full payment, taking out liens on plaintiffs' homes, filing criminal charges, and terminating access to the basic human need of water—was intentionally designed to (and did in fact) inflict emotional distress so severe that no reasonable person could be expected to endure it. *See* Sept. 2, 2021 Trial Tr. at 126:1–129:11, 132:16–134:8.

## IV.

The defendants also contest the jury's damages awards. The defendants first argue that punitive damages should not have been allowed at all on several of the claims. And even if punitive

damages were appropriate in general, defendants contend that the awards here were unlawfully excessive.

*A.*

The defendants argue that the district court should not have allowed the jury to award punitive damages on the due process, trespass, and nuisance claims. We disagree. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Alabama law provides for punitive damages on trespass claims when the trespass was "intentionally and purposefully committed" in "known violation of the owner's . . . right to the possession" and without lawful excuse. *Foust v. Kinney*, 80 So. 474, 475 (Ala. 1918). Punitive damages may be awarded for nuisances that are "wanton" or "attended by circumstances of aggravation." *Seale v. Pearson*, 736 So. 2d 1108, 1113 (Ala. Civ. App. 1999) (citation and internal quotation marks omitted).

To state those legal standards is to resolve the issues. As already noted, there was sufficient evidence for the jury to find that the defendants' insufficient procedures were intentional, designed to harm customers, and calculated to force them to pay erroneously imposed charges. The evidence was also sufficient for the jury to find that the defendants' agents entered plaintiffs' properties without notice, which was required by the very standards the defendants themselves authored. Punitive damages were thus

appropriate for the due process and trespass claims. And the jury was certainly entitled to find that the defendants wantonly interfered with plaintiffs' enjoyment of their property by terminating essential services and hanging the threat of foreclosure over plaintiffs' heads, such that punitive damages were also appropriate on the nuisance claims.

*B.*

The defendants next attack the amounts of the punitive damages awards. These attacks take three forms: (1) some of the awards overlap and are therefore unlawful double recoveries; (2) even if there is no overlap, some of the awards are excessive under the federal or state constitutions; and (3) even if there are no constitutional problems, some of the awards exceed an Alabama statutory cap. We address each issue in turn.

1.

Invoking the general rule against double recoveries, the defendants ask us to zero out the punitive damages awards on some of the claims. They say that only one of the awards on the trespass and nuisance claims can remain in effect because those two awards are predicated on the same fact—that defendants' agents entered plaintiffs' properties without consent or any other legal justification. The defendants make the same argument with respect to the awards for the state law deprivation of property rights claim and the Fourteenth Amendment due process claim: Both claims are

based on deprivations of property and thus the awards completely overlap.

The defendants' double recovery concerns are unfounded. The jury's punitive damages awards are each linked to claims that protect distinct legal rights and interests. As we have already explained, the state law deprivation of property rights claims and the Fourteenth Amendment due process claims are not the same. Neither are the trespass and nuisance claims. The "same conduct" will "often" give rise to liability for both because trespass and nuisance are "separate torts for the protection of different interests." *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 527 (Ala. 1979). The mere fact that defendants simultaneously violated numerous legal rights and interests does not create a double recovery issue. *See id.*; *cf. Johns v. A.T. Stephens Enters., Inc.*, 815 So. 2d 511, 517 (Ala. 2011) ("[A] single transaction can support an award of damages for both breach of contract and fraud when there is sufficient evidence in the record to support each claim and each award.").

2.

Next, the federal and state constitutional arguments. Both the Supreme Court of the United States and the Supreme Court of Alabama have enumerated multi-factor tests to assess the constitutionality of punitive damages awards. *See State Farm Mut. Auto. Ins. v. Campbell*, 538 U.S. 408 (2003); *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559 (1996); *Green Oil Co. v. Hornsby*, 539 So. 2d 218 (Ala. 1989); *Hammond v. City of Gadsden*, 493 So. 2d 1374 (Ala. 1986). Here, the pertinent factors are "the degree of reprehensibility" of the

defendants' conduct and "the disparity between the harm or potential harm suffered by" the plaintiffs and the awards of punitive damages. *Gore*, 517 U.S. at 574–75; *Green Oil Co.*, 539 So. 2d at 223.

a.

In assessing the constitutionality of any punitive damages award, the reprehensibility of the defendant's conduct is the "most important" consideration. *State Farm*, 538 U.S. at 419 (citation omitted); *Pensacola Motor Sales, Inc. v. Daphne Auto., LLC*, 155 So. 3d 930, 949 (Ala. 2013). By awarding punitive damages, the jury necessarily found that defendants acted "with malice, oppression, fraud and/or suppression." Jury Instructions at 18. Such findings are hardly surprising in light of the evidence that the defendants imposed hefty false charges, refused partial payments, ignored any attempts to dispute the false charges without full payment, placed liens on plaintiffs' homes, and instituted criminal process against them. And all of that was of course in addition to the fact that the defendants unjustifiably deprived the Slones and Lawrences of water, the most basic of human needs. The reprehensibility factor thus weighs heavily in favor of upholding the jury's punitive damages awards here.

b.

The defendants next say that the disparity between the harm the plaintiffs suffered and the punitive damages awards renders the latter excessive. Recall that the jury awarded compensatory damages only on the outrage claims. For every other claim upon which

22                    Opinion of the Court                    22-12913

the plaintiffs succeeded, the jury awarded $1 in nominal damages and then imposed anywhere from $30,000 to $702,000 in punitive damages. The defendants argue that any punitive damages award that is more than four times the compensatory damages awarded violates the United States Constitution and that any punitive damages award that is more than three times the compensatory damages awarded violates the Alabama Constitution. *See State Farm*, 538 U.S. at 425 ("[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."); *S. Pine Elec. Co-op. v. Burch*, 878 So. 2d 1120, 1128 (Ala. 2003) ("A ratio of 3:1 is presumptively reasonable." (citation and internal quotation marks omitted)).

The defendants' mechanical application of ratios is misguided. Those numbers are "guideposts," not ironclad rules. *See Gore*, 517 U.S. at 574, 582–583. And the compensatory-to-punitive analysis is especially unhelpful when the plaintiff suffered little economic harm or was awarded only nominal damages. In such cases, adherence to a strict compensatory-to-punitive test would undermine the imposition of punitive damages as an exercise of the federal and state governments' authority to "punish[] unlawful conduct and deter[] its repetition." *Gore*, 517 U.S. at 568, 582–83; *see State Farm*, 538 U.S. at 425. Accordingly, "several of our sister courts have held that the single-digit ratio analysis does not apply to punitive awards accompanying nominal damages," *Jester v. Hutt*, 937 F.3d 233, 242 (3d Cir. 2019) (collecting cases), or to cases in which "a jury only awards . . . a small amount of compensatory

damages," *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 154 (4th Cir. 2008) (collecting cases).

None of that is to say a jury's punitive damages award can be entirely untethered from a defendant's conduct. It just means that, when a jury does not award compensatory damages or otherwise make a finding of some actual harm, we need a different starting point for our analysis. Because the point of punitive damages is to punish past misconduct and deter similar misconduct in the future, we think it important to consider what the defendant stood to gain and what harm the plaintiffs could have suffered. Those considerations will better enable us to determine whether the punitive damages awards here are reasonable punishment and deterrence measures. *See Gore*, 517 U.S. at 581 n.34; *Mobile Infirmary Med. Ctr. v. Hogden*, 884 So. 2d 801, 816–18 (Ala. 2003).

Had the defendants' process played out as intended, they stood to gain hundreds of thousands of dollars in false service charges and unjustified fees and expenses. The defendants would have received that money either directly from the plaintiffs or by enforcing the liens placed on the plaintiffs' homes and compelling foreclosure proceedings. Correspondingly, the plaintiffs stood to lose hundreds of thousands of dollars—either in cash, home equity, or both—and would have suffered the severe emotional distress that goes along with such significant and unjustified losses. Their freedom was also in jeopardy, as the defendants were pursuing criminal charges. Any "shock" from the "disparity between the punitive award[s] and the compensatory award[s]" therefore

"dissipates when one considers the potential loss to [the plaintiffs] . . . had [the defendants] succeeded in [their] illicit scheme." *Gore*, 517 U.S. at 581 n.34 (quoting *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 (1993)). The punitive damages awarded here are reasonable both to punish defendants and to deter them and others from committing similar torts.

### 3.

The defendants also contend that many of the punitive damages awards for the state law claims are excessive under Alabama statutory law. An Alabama statute provides that "no award of punitive damages shall exceed three times the compensatory damages of the party claiming punitive damages or five hundred thousand dollars ($500,000), whichever is greater." Ala. Code § 6-11-21(a). The $500,000 cap is adjusted for inflation. *See id.* § 6-11-21(f).

The district court concluded that this statute did not apply because "no Plaintiff received more than $500,000 in punitive damages per claim from any Defendant[.]"[2] The district court's analysis treats each spouse as an individual plaintiff, splits the punitive damages award down the middle between each, and then uses each spouse's half as the relevant number for purposes of determining the statute's applicability. So, with the Davises' tort of outrage

_____

[2] The defendants also argue that a separate damages cap, applicable to "small businesses," requires reducing the punitive damages awards. *See* Ala. Code § 6-11-21(b)–(c). The district court rejected that argument, and we find no clear error in its fact-intensive determination that the defendants were not small businesses under the statute.

award, for example, the district court was saying that the jury's $100,000 compensatory damage award and $1,000,000 punitive damage award breaks down into $50,000 in compensatory damages each for Lindsay Davis and Benjamin Davis, as well as $500,000 in punitive damages each for Lindsay and Benjamin. Put another way, what looks like one punitive damages award of $1,000,000 is, to the district court, really two $500,000 awards, one to each spouse as an individual party.

We disagree with the district court. The statute imposes the higher of two potential caps on an "award": (1) "three times the compensatory damages of the party claiming punitive damages" or (2) "five hundred thousand dollars ($500,000)." Ala. Code § 6-11-21(a). We believe the correct way to implement the $500,000 cap (as opposed to the three times compensatory damages cap) is to look at the amount of each punitive damages award on the verdict form. The award is either below the cap or above the cap. It's as simple as that.

The district court's recognition that each spouse is a separate party does not change the result. The higher of the two statutory caps for all the claims in these cases is the flat $500,000 cap. That is the only cap that matters for our purposes. Unlike the cap for "three times the compensatory damages of *the party* claiming punitive damages," the $500,000 cap is not evaluated on a per party basis. *Id.* (emphasis added). And the record makes clear that the "awards" here were to each couple as a unit. The jury instructions treated each married couple as a single unit, and for each claim, the

jury entered a single award to each couple on the verdict form. Likewise, the district court's final judgments treated each married couple as having one "Fourteenth Amendment *Claim*," one "Trespass *Claim*," one "[Outrage] *Claim*," one "Private Nuisance *Claim*," and one "Deprivation of Property Rights *Claim*," with the full amount of each jury award given to the relevant married couple, not distributed in halves to each spouse. So the district court's decision to treat each couple as two separate parties for purposes of remittitur was irrelevant—either way, there is still only one "award" on each claim to assess against the $500,000 cap.

For their part, the defendants ask that we "aggregate" each married couple's punitive damages from the trespass, private nuisance, and deprivation of property rights claims and then impose the cap to that number. Using the Slones as an example, the defendants would have us bundle the $30,000 trespass award, the $105,000 nuisance award, and the $665,000 deprivation of property rights award and allow the Slones to receive only $500,000 to cover those three claims. The defendants support that consolidation request by stating that the "statutory cap applies to each 'occurrence,'" and "Alabama courts have held that all injuries that stem from a single proximate cause are the result of a single 'occurrence.'" They further contend that the trespass, nuisance, and deprivation of property rights claims "are all based on a single event in which [the defendants'] agent entered upon the [plaintiffs'] land and turned off their water supply[.]"

The defendants' argument is based on an irrelevant provision of the statute and a misreading of the jury's verdicts. That is, they cite "occurrence" language in Alabama Code Section 6-11-21(c), which defines a "[s]mall business" as one "having a net worth of two million dollars ($2,000,000) or less at the time of the occurrence made the basis of the suit." That statutory provision is not the one we are applying. Adding to the irrelevance of that particular argument, the defendants' support for the definition of "occurrence" is an insurance coverage dispute case that pre-dates the punitive damages statute by about fifteen years. *See Home Indem. Co. v. Anders*, 459 So. 2d 836 (Ala. 1984). And to round things out, the defendants are simply incorrect that the trespass, nuisance, and deprivation of property rights claims all arose from the same event. The jury instructions allowed (and in some instances required) the jury to base its verdicts for each claim on different facts. *See* Jury Instructions at 9–13.

In short, because there is no argument that the higher cap is three times the compensatory damages of the party seeking punitive damages, Alabama law requires that each award of punitive damages be capped at $500,000, adjusted for inflation. That means that each award arising from a state law claim must be assessed for whether it is above that cap. The three $30,000 punitive damages awards arising from the trespass claims are clearly permissible. As are the Slones' $105,500 nuisance award and the Lawrences' $55,500 nuisance award. So too for the Slones' and Lawrences' $500,000 outrage awards. But the Slones' $665,000 award for deprivation of property rights, the Lawrences' $702,000 award for

deprivation of property rights, and the Davises' $1,000,000 award for outrage are in excess of $500,000.

Because the $500,000 punitive damages cap adjusts for inflation, *see* Ala. Code. § 6-11-21(f), we cannot implement the cap ourselves in the first instance. On remand, the district court should reconsider the applicability of Alabama's statutory punitive damages cap to any award that is nominally over $500,000. Specifically, it should determine whether any are above an inflation-adjusted punitive damages cap and, if so, then it should remit them to that inflation-adjusted amount.

## V.

The judgment of the district court is **AFFIRMED in part and REVERSED in part**. These cases are **REMANDED** for further proceedings.